UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

JUSTIN A. MARTINEZ,
     Petitioner,

vs.                        Case No.:  4:21cv249/WS/ZCB

SECRETARY DEPARTMENT OF
CORRECTIONS,
     Respondent.
_____/

## **REPORT AND RECOMMENDATION**

This is a federal habeas corpus case filed under 28 U.S.C. § 2254. Petitioner, Justin Martinez, is serving a twenty-year prison sentence for attempted second degree murder.  Petitioner's § 2254 petition presents seven grounds for relief.  (Doc. 5).  Respondent has answered, and Petitioner has replied.  (Docs. 13, 22).  For the reasons below, Petitioner is not entitled to habeas relief.[1]

---

[1] This matter may be resolved based on the pleadings and attachments without an evidentiary hearing.  Rule 8(a), Rules Governing Section 2254 Cases.

## I.    Factual Background[2]

This case stems from a shooting that occurred in Tallahassee, Florida on February 16, 2009.  In the late afternoon on that day, two Tallahassee police officers—Investigators Lewis and Wester—were driving down Springsax Rd. in an unmarked car.  (Doc. 14-4 at 32).  They suddenly noticed a male, later identified as Chris Sutton, running across the road from the K&S store.  (*Id.* at 32, 52, 58).  Another male, later identified as Petitioner, was chasing Sutton.  (*Id.* at 32-33).  Sutton had a bookbag in his hands as he ran.  (*Id.* at 144).

The officers watched as the two men ran between buildings and encountered a chain link fence.  (*Id.*).  Sutton scaled the fence.  (*Id.* at 144, 156).  When Petitioner reached the fence, the officers saw him pull a gun from his waistband, point it in the direction where Sutton was running, and then fire a shot.  (*Id.* at 32-33, 58-59).  The officers saw the flash come from the gun's barrel as it was fired.  (*Id.* at 33, 59-60).

---

[2] The facts are taken from the trial transcript.  (Docs. 14-4, 14-5).  The Court refers to the document numbers and page numbers automatically assigned by the Court's electronic filing system.

Investigator Lewis jumped out of the car, yelled "police," drew his service weapon, and ordered Petitioner to drop the gun and get on the ground. (*Id.* at 34, 36). Petitioner fled, instead. (*Id.*). The officers got back into their car and gave chase. (*Id.* at 36). They located Petitioner a block away and took him into custody. (*Id.*).

Sutton, meanwhile, ran into a nearby home. (*Id.* at 62-64, 112). He informed the startled homeowner, Maggie Reshard, that someone was trying to kill him. (*Id.* at 68, 113). Sutton also noticed what he believed to be a bullet hole in his baggie shirt that had not been there previously. (*Id.* at 99-100). Police officers were all around the area, and Sutton—a man with a criminal history and poor relationship with the police—did not want to interact with the police. (*Id.* at 126-27). So, Sutton ran out of the house and away from the police. (*Id.*).

Officers searched the area around where Petitioner was arrested, and they found a loaded Glock pistol. (Doc. 14-4 at 178-180). Officers also found three shell casings in the area surrounding the K&S store. (Doc. 14-5 at 8-17). Two of the casings were behind the store, and one was near the fence where the officers saw Petitioner fire a shot. (*Id.*).

3

Petitioner was subsequently charged with attempted first degree murder with a firearm and attempted second degree murder with a firearm. (Doc. 14-61 at 240). The case proceeded to a jury trial. Multiple witnesses testified about the events preceding Petitioner shooting at Sutton.

For his part, Sutton testified that he was in a car with Petitioner and a few other people. (Doc. 14-4 at 94). The car was parked at the K&S store. (*Id.*). While parked, another guy (Sutton's "godbrother") entered the car. (*Id.* at 95-96). Sutton said he needed some cash. (*Id.* at 96). Sutton's godbrother then grabbed a bag from the car and started walking away. (*Id.* at 96-97).

Soon after that happened, Petitioner pulled a Glock .40 pistol and pointed it at Sutton's head. (*Id.* at 98). Petitioner looked angry and appeared as though he was about to pull the trigger. (*Id.* at 99). Sutton began walking away. (*Id.*). He then heard gunshots. (*Id.*). At that point, he picked up the bag that had been dropped by his godbrother and started running. (*Id.*). As Sutton was running, Petitioner continued to shoot at him. (*Id.* at 99-100, 104). In total, Sutton heard four or five gunshots.

(*Id.* at 112).  Fearing for his life, Sutton ran into what turned out to be Ms. Reshard's house to hide.  (*Id.* at 101).

The driver of the car, Ignacio "Nacho" Hernandez, told the jury a somewhat different story.  According to Hernandez, when he pulled into the K&S parking lot Petitioner was the only other passenger in the car.  (Doc. 14-5 at 81).  Hernandez went inside the store, and Petitioner remained in the car.  (*Id.* at 82).  When Hernandez came back outside, he saw three men standing at the car.  One of those men was Sutton.  (*Id.* at 83-84).  Two of the men took off running, and Petitioner and the third man were "tussling."  (*Id.* at 88).[3]  The third man then took off running, and Petitioner chased after him. (*Id.* at 84-85, 88).

Shamar Rackard also testified as to the events in the K&S parking lot.   He told two versions of what happened.   At Petitioner's trial, Rackard said he was outside the K&S store on February 16, 2009, when he heard shots fired from different directions and "more than two

---

[3] Hernandez initially testified at trial that Petitioner and the man were tussling over a gun, but he later admitted he did not actually see a gun. (*Id.* at 88, 90).

different guns." (*Id.* at 174). Rackard ran into the store and hid behind the counter. (*Id.* at 171-74).

Rackard denied talking to the police after the shooting. (*Id.* at 169-70, 173). Officer Robert Wyche testified, however, that he spoke with Rackard. (Doc. 14-5 at 63-65). Rackard told Officer Wyche that a "friend of a friend" asked hm if he wanted a ride to the store, so Rackard got in the back seat. (*Id.* at 63). Rackard noticed a gun in the lap of another person in the back seat. (*Id.*). At the store, the driver got out and entered the store. (*Id.*). The driver was in the store for a while, so Rackard tried to exit the vehicle to determine what was taking so long. (*Id.*). Rackard was unable to exit through a rear door, so he exited through one of the front doors. (*Id.* at 63-64). As Rackard exited the vehicle, the person in the back seat with the gun said, "You're going to die." (*Id.* at 64-65).

Regardless of exactly what happened in the parking lot before the shooting, the prosecution established at trial that Petitioner pulled a gun, pointed it, and shot it as he chased Sutton. Aside from the eyewitness testimony of the officers who saw Petitioner point and shoot the gun, the prosecution introduced several pieces of forensic evidence. First, the

6

prosecution established that Petitioner's DNA was on the trigger of the recovered Glock pistol. (Doc. 14-4 at 194; Doc. 14-5 at 43). Additionally, ballistics evidence showed that the three shell casings found at the scene had been fired from the Glock pistol. (Doc. 14-5 at 24-26).

At trial, the defense advanced an accidental discharge theory. More specifically, the defense claimed that Petitioner accidentally discharged the firearm as he attempted to climb the fence while in pursuit of Sutton. (Doc. 14-5 at 138-39). Thus, the defense argued that Petitioner did not fire the gun with the requisite intent. The prosecution countered the accidental discharge theory with evidence showing that the Glock pistol had three safety mechanisms, and that it took 6 ¾ pounds of pressure to pull the Glock's trigger. (*Id.* at 23, 28-30). This was an "average" amount of trigger pull and was not a "hair trigger." (*Id.* at 23, 30). Additionally, the prosecution pointed to the testimony of the officers who saw Petitioner raise the gun, point it, and then shoot it.

The jury convicted Petitioner of attempted second degree murder, with specific findings that Petitioner used, possessed, and discharged a firearm. (Doc. 14-2 at 185-87; Docs. 14-4 and 14-5). The trial court

sentenced Petitioner to twenty years' imprisonment.  (Doc. 14-3 at 1-9; Doc. 14-7).

## II.    Procedural History

Petitioner appealed his conviction to Florida's First District Court of Appeal ("First DCA").  (Doc. 14-11).  That court affirmed.  (Doc. 14-14). Next, Petitioner filed a state habeas petition alleging ineffective assistance of appellate counsel for failing to raise an argument regarding the legality of his sentence.  (Doc. 14-21).  The First DCA remanded for resentencing.  (Doc. 14-23).  On remand, the trial court again sentenced Petitioner to twenty years' imprisonment.  (Doc. 14-34 at 99-107, 130-88). Petitioner appealed the new judgment, and the First DCA affirmed. (Docs. 14-39, 14-42).

Petitioner then filed a postconviction motion under Florida Rule of Criminal Procedure 3.850.  (Doc. 14-61).  The trial court denied the motion, and the First DCA affirmed.  (*Id.* at 240-47, 392-543; Docs. 14-62, 14-67).  Next, Petitioner unsuccessfully sought relief in the First DCA on claims of ineffective assistance of appellate counsel and "Manifest Injustice."  (Docs. 14-55, 14-57, 14-71; Docs. 14-56, 14-58, 14-72).

Having struck out in state court, Petitioner moved his postconviction efforts to federal court by filing the current habeas petition under 28 U.S.C. § 2254. (Doc. 1). His petition presents seven grounds for relief. (Doc. 5). Three claim ineffective assistance of trial counsel, one claims newly discovered evidence of actual innocence, one claims sentencing error, one claims ineffective assistance of appellate counsel, and the last claims the "cumulative effect" of the alleged errors at trial requires reversal. Respondent has answered the petition, asserting procedural defenses to some of Petitioner's claims and contending that they all lack merit. (Doc. 13). As explained below, Grounds One, Two, Three, Six, and Seven lack merit, Ground Four is not cognizable on federal habeas review, and Ground Five is procedurally barred.

### III.   Legal Standard for 28 U.S.C. § 2254 Petitions

When considering a state prisoner's § 2254 petition, a federal court is not typically sitting as an appellate court with the mandate of correcting state court errors. *See Shinn v. Ramirez*, 596 U.S. 366, 377 (2022) (explaining that a federal habeas proceeding is not "a substitute

for ordinary error correction through appeal"). Instead, under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal habeas court applies a "highly deferential standard of review for evaluating state-court rulings [on the merits], which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (citation omitted).

Under AEDPA, a federal court may invalidate a state conviction only if the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). The state court's factual determinations "shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

"[T]o be contrary to clearly established federal law, the state court must either (1) apply a rule that contradicts the governing law set forth by Supreme Court case law, or (2) reach a different result from the

10

Supreme Court when faced with materially indistinguishable facts." *Ward v. Hall*, 592 F.3d 1144, 1155 (11th Cir. 2010) (cleaned up). An "unreasonable application" of federal law occurs "if the state court correctly identifies the governing legal principle from [the Supreme Court's] decisions but unreasonably applies it to the facts of the particular case." *Bell v. Cone*, 535 U.S. 685, 694 (2002). "To meet [the unreasonable application] standard, a prisoner must show far more than that the state court's decision was merely wrong or even clear error." *Shinn v. Kayer*, 592 U.S. 111, 118 (2020) (cleaned up). Rather, the state court's application of federal law must be "so obviously wrong that its error lies beyond any possibility for fairminded disagreement." *Id.* (cleaned up). This standard reflects that the "writ of habeas corpus is an extraordinary remedy that guards only against extreme malfunctions in the state criminal justice systems." *Ramirez*, 596 U.S. at 377 (cleaned up).

## IV.   Discussion

### A.   Ground One:  "Defense counsel rendered ineffective assistance by misadvising Petitioner Martinez that if he testified at trial, the State could impeach him with his prior conviction."

11

Petitioner first alleges that his trial attorney provided ineffective assistance by incorrectly telling him that if he testified, then he could be impeached with his prior conviction. (Doc. 5 at 16). Petitioner alleges his only prior adult felony conviction was from Miami-Dade County for carrying a concealed firearm. (*Id.*). According to Petitioner, that conviction could not have been used for impeachment because adjudication had been withheld. (*Id.* at 16-18). Nevertheless, Petitioner says his trial attorney said the conviction could be used for impeachment if he testified. Based on that information from his attorney, Petitioner says he elected not to testify.

Petitioner now says that if he had testified, then he would have been able to explain to the jury that he shot at Sutton in self-defense. More specifically, Petitioner claims he would have testified that Sutton had pointed a gun at him before Petitioner shot at Sutton. According to Petitioner, had he testified in this manner there is a reasonable probability the jury would have acquitted him because the shooting was justified. (*Id.* at 20).

12

Respondent urges the Court to reject Petitioner's claim for two reasons. First, because it is unexhausted. Second, because it lacks merit. Let's look at the exhaustion argument first.

### 1. Respondent's exhaustion argument

In Ground Three of his Rule 3.850 motion, Petitioner argued that he "chose not to testify because defense counsel led him to believe that if he took the stand the State would be permitted to elicit the specific nature of his prior felonies." (*Id.* at 11). Respondent argues that although that claim and the claim presented today both involve advice regarding prior conviction impeachment, the claims are based on two different theories. (*Id.*). Because the two claims are not identical, Respondent says Petitioner has failed to properly exhaust. Petitioner disagrees, arguing that his *pro se* Rule 3.850 motion is entitled to a liberal construction, and under that construction, he exhausted this claim by raising Ground Three in his Rule 3.850 motion.[4] Petitioner has the better argument.

---

[4] Here is what Petitioner said in Ground Three of his Rule 3.850 motion: "Defense counsel rendered ineffective assistance of misleading [sic] Martinez on what the State would be permitted to elicit from him if he

Congress passed the AEDPA to protect important interests of finality, federalism, and comity between state and federal courts. *Williams v. Taylor*, 529 U.S. 362, 436 (2000). It is vital to the maintenance of those interests that federal courts do not entertain a habeas claim unless the state court first had a chance to consider the claim. *Id.* at 436–37. Only then may a prisoner present "that exact same claim" to the federal courts—"adjacent claims or nominally similar claims do not make the cut." *Green v. Sec'y, Dep't of Corr.*, 28 F.4th 1089, 1158 (11th Cir. 2022).

Respondent is correct that Petitioner's *pro se* Rule 3.850 motion claimed that Petitioner chose not to testify because counsel led him to believe the prosecution would be able to introduce evidence regarding the *nature* of his prior felonies. (Doc. 14-61 at 135). At the Rule 3.850 evidentiary hearing, however, Petitioner (then represented by counsel) expanded his ineffectiveness claim, through evidence and argument, to effectively match the claim he now asserts in Ground One of the § 2254

chose to testify on his own behalf." (Doc. 22 at 1-2 (quoting Doc. 14-61 at 134)).

petition.  (Doc. 14-61 at 425-27, 500-16, 526-30).  Indeed, when ruling on

Petitioner's Rule 3.850 motion the state court recognized that the claim

had been expanded, and it ruled on the expanded claim.  (*Id*. at 241-42).

Petitioner also presented the expanded claim to the First DCA in his

appeal from the denial of his Rule 3.850 motion.  (Doc. 14-62 at 23-29).

Because the state courts had the opportunity to consider (and did, in fact,

consider) the same argument Petitioner is making today, he has

sufficiently exhausted Ground One.  The Court will now proceed to the

merits of Ground One.

### 2.   Merits of Petitioner's ineffective assistance argument

Ineffective assistance of counsel claims are governed by the

standard found in *Strickland v. Washington*, 466 U.S. 668 (1984).  To

prevail under *Strickland*, a petitioner must show that (1) counsel's

performance was constitutionally deficient, and (2) prejudice resulted.

*Id.* at 687.  The deficiency prong focuses on "whether counsel's assistance

was reasonable considering all the circumstances."  *Id.* at 688.  Trial

counsel is "strongly presumed to have rendered adequate assistance and

made all significant decisions in the exercise of reasonable professional

judgment." *Id.* at 690.  The prejudice prong focuses on whether the petitioner has shown there is a "reasonable probability" that the outcome would have been different absent counsel's deficient performance.  *Id.* at 694.  To show prejudice, "likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011).[5]

Here, the state courts rejected Petitioner's argument that his trial counsel was ineffective for misadvising him about the prosecution's ability to impeach using his prior conviction.  The last state court to consider this argument was the First DCA.  The First DCA applied *Strickland* and concluded that Petitioner had shown neither deficient performance nor prejudice.  (Doc. 14-67).  This Court must defer to the

---

[5] Both the *Strickland* standard and the standard for relief under § 2254 are "highly deferential." *Richter*, 562 U.S. at 105.  And when—in a case like the current one—"the two apply in tandem, review is doubly" deferential.  *Id.* (cleaned up).  The Supreme Court has warned that "habeas courts must guard against the danger of equating unreasonableness under *Strickland*['s]" deficient performance prong with "unreasonableness under § 2254(d)." *Id.*  Thus, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

First DCA's conclusions if they are reasonable. *Wilson v. Sellers*, 584 U.S. 122, 125 (2018).

When assessing reasonableness, the Court need not strictly limit its review to the particular justifications that the state court provided; rather, the Court may consider any potential justification for those reasons. *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1036 (11th Cir. 2022). "If, as here, the specific reason … was that the petitioner wasn't prejudiced by his counsel's deficient performance, [the Court] can, in evaluating whether that reason was reasonable, consider additional rationales that support the state court's prejudice determination." *Id.* (cleaned up). Additionally, if the state court's rejection of Petitioner's ineffectiveness claim was a reasonable application of *Strickland*'s prejudice prong, then the federal habeas court need not address the state court's assessment of the deficient performance prong. *Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000).

Here, the Court will not address the deficient performance prong because regardless of whether counsel performed deficiently, the state court did not act unreasonably by finding no prejudice. To establish

17

prejudice when a petitioner alleges that his decision not to testify was based on counsel's erroneous advice, the petitioner "must show two critical components: (1) that he would in fact have testified in his own defense had he been informed adequately about his right to do so, and (2) that his proposed testimony would have altered the outcome of the trial." *Driggers v. Sec'y, Dep't of Corr.*, 834 F. App'x 510, 514 (11th Cir. 2020). The Court accepts Petitioner's statement that he would have testified absent counsel's advice and, therefore, the first component is satisfied. But the second is not.

To resolve the second component, the Court asks the following question: Did the First DCA reasonably conclude that Petitioner's proposed testimony would not have altered the outcome of the trial? The answer is "yes." And here is why. At the Rule 3.850 evidentiary hearing, Petitioner told the state court what he would have said to the jury had he testified. (Doc. 14-61 at 501-06). The gist of what Petitioner claims he would have testified to is as follows:

- Petitioner was seated in the car outside the K&S store when three men approached.

- One of the men was Sutton, and another was Justin Jones. Jones pulled a gun on Petitioner and demanded money. Meanwhile, Sutton grabbed a bag of money from Petitioner.

- Petitioner and Jones then got into a scuffle, during which Jones dropped the gun. Petitioner picked up the gun, put it in his waistband, and started chasing after Sutton who was running away.

- When they reached the fence, Sutton jumped over it. Once Sutton was over the fence, Sutton pointed a gun at Petitioner.

- Upon seeing that Sutton had a gun pointed at him, Petitioner reached into his waistband and retrieved the gun he had taken moments ago from Jones. Petitioner raised the gun and shot it in self-defense.

After telling this version of events at the Rule 3.850 hearing, Petitioner was subject to cross examination by the prosecution. During cross, Petitioner admitted that he was interviewed by the police after the incident yet he never mentioned seeing Sutton with a gun. (Doc. 14-61 at 516). Petitioner further admitted that when he testified at his state court bond hearing shortly after his arrest, he provided a lot of information about the incident but said nothing about seeing Sutton with

19

a gun.  (*Id.* at 513-16).  The transcript from Petitioner's bond hearing

shows that he provided the following description of what happened:[6]

> …I kept running after the guy [Christopher Sutton].
> And by that time he was—the dude—when I got to the
> gate he wasn't in my, I would say like in my vision—I
> didn't see him, but I just wanted to try to jump the gate.
> The gun went off.  But the young man wasn't in my
> like—he wasn't nowhere in my area because I didn't
> know exactly where he was, but I tried to get over the
> gate.
>
> By that time the gun went off by me trying to jump over
> the gate.  From there that's when I tried to run—keep
> running to try to catch him that's when the officer rolled
> on the next street.

(Doc. 14-61 at 283).  According to Petitioner, he did not say anything

about Sutton having a gun either in his police interview or during his

bond hearing testimony because nobody had asked him that specific

question.  (*Id.* at 514, 516).

Having considered the record, there is no reasonable probability the

outcome of the trial would have been different had Petitioner testified

---

[6] Petitioner's collateral counsel requested that the state court take
judicial notice of "everything that's in the court file" including the
transcripts.  (Doc. 14-61 at 396-97).  The state court granted the request.
The transcript of the pre-trial bond hearing was included in the court file.
(Doc. 14-2 at 76-131).

and told the jury the same story that he told the state court at his Rule 3.850 hearing.  First, what Petitioner says he would have told the jury is entirely inconsistent with the defense theory advanced at trial.   In opening statements, Petitioner's attorney asserted that this was an accidental shooting that occurred when the gun suddenly discharged. That same theory was advanced through defense counsel's cross examination of the prosecution's witnesses.  Thus, had Petitioner taken the stand and claimed that he acted in self-defense, his testimony would have been inconsistent with the theory of the case that had been presented to the jury up to that point.  Any reasonable juror would have recognized the mid-trial change in theory (which the prosecution certainly would have highlighted) and made a negative credibility inference from it.

Second, Petitioner's credibility would have been shattered when the prosecution cross examined him with his bond hearing testimony and his prior statement to the police.  It defies common sense to believe that—if Sutton had actually pointed a gun at Petitioner—Petitioner would not have mentioned it in his bond hearing testimony.  In fact, Petitioner

21

testified at his bond hearing that he did not know where Sutton was when Petitioner's gun discharged.  Yet had Petitioner testified at trial as he said he would have at the Rule 3.850 hearing, Petitioner would have been asking the jury to accept that he not only knew where Sutton was but actually saw Sutton point a gun at him.  Under the circumstances, no reasonable juror would have accepted Petitioner's proposed testimony as credible.  *See Pryor v. Fla. Dep't of Corr.*, No. 1:16cv245, 2018 WL 3245016, at *6 (N.D. Fla. Mar. 28, 2018), *adopted by* 2018 WL 3244091 (rejecting ineffective assistance of counsel claim based on incorrect advice about prior conviction impeachment because the petitioner's proposed testimony would not have changed the trial's outcome); *see also United States v. Prieto*, 712 F. App'x 763, 767 (10th Cir. 2017) (affirming denial of habeas relief where the petitioner claimed his attorney's advice prevented him from testifying and explaining that there was "no reasonable probability of a different outcome" even if the petitioner had testified).  Because "some fairminded jurists could agree with" the First DCA's conclusion that Petitioner failed to show prejudice, "federal habeas

22

relief must be denied" on Ground One. *Meders v. Warden, Ga. Diagnostic Prison*, 911 F.3d 1335, 1349 (11th Cir. 2019).

### B. Ground Two: "Defense counsel rendered ineffective assistance of counsel by failing to retain and present at trial a ballistics expert to respond to Christopher Sutton's assertion he had a bullet hole in his shirt."

Petitioner next claims that trial counsel was ineffective for failing to hire a ballistics expert to refute Sutton's testimony that there was a bullet hole in his shirt. (Doc. 5 at 22-25). According to Petitioner, if trial counsel had hired such an expert, then the jury likely would have reached a different outcome. (*Id.* at 22-23). In support of that argument at his Rule 3.850 hearing, Petitioner offered the testimony of Joshua Wright, a ballistics expert. (Doc. 14-61 at 399-415). Wright testified that—although he had never examined Sutton's shirt or seen any pictures of it—if he had been called as a witness at trial, he would have testified that the hole in Sutton's shirt was not caused by a bullet. (*Id.* at 407).

Respondent has asserted an exhaustion defense to Ground Two. (Doc. 13 at 13-16). Respondent has also addressed the merits of Ground Two and argued that Petitioner is not entitled to relief. The Court will take up the exhaustion issue first, and then move to the merits argument.

23

### 1.    Exhaustion of Ground Two

According to Respondent, Petitioner failed to adequately exhaust the claim that trial counsel was ineffective for failing to retain a ballistics expert to testify regarding Sutton's shirt.  As explained below, the exhaustion argument lacks merit.

Generally, a habeas petitioner cannot raise claims in federal court that were not exhausted in state court. *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010) (cleaned up).  The exhaustion doctrine "give[s] the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995).  To exhaust, a habeas petitioner is required to "fairly present every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review." *Mason*, 605 F.3d at 1119 (cleaned up). This means that a "state prisoner [must] present the state courts with the same claim he urges upon the federal courts." *Picard v. Connor*, 404 U.S. 270, 275 (1971).  And it must be presented in such a way that the state courts are "alerted to the fact that the prisoner[] [is] asserting

claims under the United States Constitution." *Duncan*, 513 U.S. at 365-66.

Here, the record demonstrates that the claim underlying Ground Two of Petitioner's habeas petition was "fairly presented" to the Florida state courts. Although Petitioner's Rule 3.850 motion did not raise the precise issue of whether counsel was ineffective for failing to retain a ballistics expert, Petitioner orally amended Claim 7 of his motion to include this issue. (Doc. 14-61 at 533). The state trial court denied the Rule 3.850 motion in its entirety. (Doc. 14-61). Petitioner appealed to the First DCA, where he specifically argued that trial counsel "rendered ineffective assistance of counsel by failing to retain and present a ballistics expert. . . ." (Doc. 14-62 at 29). Petitioner stated in his First DCA brief that the basis for the ineffective assistance of counsel claim was the "Sixth Amendment to the United States Constitution." (*Id.* at 31). And the State responded to that issue in its First DCA brief. (Doc. 14-65 at 12-13). The First DCA rejected Petitioner's arguments and affirmed the trial court because Petitioner had not met the *Strickland*

standard.[7]  (Doc. 14-67).  Because the issue Petitioner has raised in Ground Two of his § 2254 petition was "fairly presented" to the state courts, Respondent's exhaustion argument is unpersuasive.

### 2.   Merits of Ground Two

Before assessing the merits of Petitioner's argument in Ground Two, it is necessary to rehash some of the testimony from Petitioner's trial and his Rule 3.850 hearing.  At trial, Sutton testified that he noticed what appeared to be "like a bullet hole" in his shirt after he heard the shot fired by Petitioner.  (Doc. 14-4 at 99-100).  Sutton further testified that "I thought it was from the fence, but then I seen [sic] it had like a little burned mark to it so I knew it had to be a bullet hole, …"  (*Id.* at 100).  Sutton discarded the shirt as he ran away and, therefore, it was neither examined by the police nor admitted into evidence.  (*Id.* at 110, 115-16).

---

[7] In habeas cases involving Florida prisoners, "claims for postconviction relief are exhausted once they are appealed to the state district court of appeal.  They need not be appealed to the Florida Supreme Court in order to be considered exhausted for federal habeas purposes."  *Barrit v. Sec'y, Fla. Dep't of Corr.*, 968 F.3d 1246, 1249 n.3 (11th Cir. 2020).

At the Rule 3.850 hearing, Petitioner presented testimony from Joshua Wright, a ballistics expert. (Doc. 14-61 at 399-415). Based on a review of Sutton's trial testimony about the hole in the shirt, Wright opined that a bullet did not create the hole. (*Id.* at 406-07). According to Wright, there should have been an exit hole in the shirt and a bullet would not have caused the type of edge described by Sutton. (*Id.* at 405-07). But Wright stated that the only way to accurately determine if the hole was caused by a bullet would have been to use microscopic techniques and chemical testing. (*Id.* at 404-05, 410-11, 415). Wright admitted that he did not do those things with the shirt and, therefore, he could not definitively say whether a bullet caused the hole. (*Id.* at 408, 414).

As noted above, the state courts rejected Petitioner's claim that counsel was ineffective for failing to call a ballistics expert. And for the reasons detailed below, it was not unreasonable for the state court to find

27

that the outcome of Petitioner's trial would not have been different had Petitioner called a ballistics expert such as Wright.[8]

It was undisputed in this case that Petitioner discharged a gun as he was chasing Sutton. There was eyewitness testimony from two police officers who saw Petitioner pull the gun, point in Sutton's direction, and then fire. (Doc. 14-4 at 33-34, 41-42, 49, 50, 59, 145, 156). The gun was recovered with Petitioner's DNA on the trigger and multiple shell casings found at the scene matched the gun. (Doc. 14-4 at 194; Doc. 14-5 at 43). The disputed issue at trial was whether Petitioner shot the gun at Sutton intentionally or whether it went off inadvertently. Regardless of whether a bullet went through Sutton's shirt, the evidence introduced at trial was clearly sufficient to establish that Petitioner acted intentionally as opposed to accidentally. And that evidence (without the bullet hole testimony) was more than sufficient for the jury to convict Petitioner.

Additionally, Wright's proposed testimony was based largely on speculation regarding the origin of the hole in Sutton's shirt. The shirt

---

[8] Because Petitioner has not satisfied his burden with respect to the prejudice prong, "the court need not address the [deficient] performance prong." *Holladay*, 209 F.3d at 1248.

had been discarded and was never examined or tested by Wright. He also

did not review any photographs of the shirt. Thus, Wright's opinion was

not based on his own observations or testing.[9] And Wright admitted that

---

[9] Indeed, it seems unlikely that Wright would have been permitted to testify at trial as to his expert opinion. That is true under the old *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), which previously governed expert testimony in Florida. The *Frye* standard "require[d] that the thing from which the expert's deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." *U.S. Sugar Corp. v. Henson*, 823 So. 2d 104, 107 (Fla. 2002) (cleaned up). Applying that standard to Wright's testimony, it seems doubtful a trial court would have found that reading a trial transcript of a lay person describing a hole is the generally accepted way that ballistics experts scientifically determine whether a hole was caused by a bullet. And the same would be true under the newer expert testimony standard found in § 90.702 of the Florida Statutes, which codified the test from *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). *See generally Miller v. State*, 379 So. 3d 1109, 1123 (Fla. 2024) (explaining that Florida has adopted the *Daubert* standard for expert testimony). Under that standard, an expert opinion must be (1) based on sufficient facts or data, (2) the product of reliable principles and methods, and (3) the witness has applied those principles and methods reliably to the facts of the case. Fla. Stat. § 90.702. These standards are designed to ensure that "speculative, unreliable expert testimony does not reach the jury." *Kemp v. State*, 280 So. 3d 81, 88 (Fla. 4th DCA 2019) (cleaned up). It is doubtful Wright's testimony (which was based solely on a transcript review of Sutton's testimony regarding the hole in the shirt) could meet the three requirements above. Wright himself stated that the only way to determine if the hole was or was not caused by bullet would be to conduct an examination—something he did not do. And, of course, Petitioner's counsel could not have performed ineffectively by failing to retain a ballistics expert to testify about the hole in the shirt when it is

he would not be able to definitively testify as to whether the hole was or was not a bullet hole because he never examined or tested the shirt. (Doc. 14-61 at 414).

Considering the strong evidence of Petitioner's intent as well as the weaknesses in Wright's proposed testimony, "some fairminded jurists could agree," *Meders*, 911 F.3d at 1349, with the First DCA's conclusion that counsel was not ineffective for failing to retain a ballistics expert to testify regarding the hole in Sutton's shirt. Accordingly, Petitioner is not entitled to relief on Ground Two.

### C.    Ground Three: "Defense counsel rendered ineffective assistance of counsel when he failed to object to a lay witness adducing inadmissible evidence."

In Ground Three, Petitioner claims that counsel performed ineffectively by not objecting to Sutton's testimony about the bullet hole in his shirt. According to Petitioner, Sutton's testimony was impermissible lay opinion testimony. (Doc. 5 at 25-28). Petitioner alleges

_____

unlikely such an expert would have been permitted testify. *See Denson v. United States*, 804 F.3d 1339, 1342 (11th Cir. 2015) (recognizing that failing to make meritless arguments is not ineffective assistance of counsel).

that, absent Sutton's testimony about the hole, there is a reasonable probability the trial's outcome would have been different. (*Id.*; Doc. 22 at 8-11).

Petitioner raised this issue before the state courts in his Rule 3.850 motion, and it was rejected. (Doc. 14-61 at 143-45; Doc. 14-62 at 34-37; Doc. 14-67). Thus, the claim has been exhausted and will be considered on the merits.

For largely the same reasons explained above with respect to Ground Two, the state courts reasonably found that Petitioner failed to show prejudice under *Strickland*. There was more than ample evidence aside from Sutton's testimony about the hole in his shirt to prove that Petitioner acted with the requisite intent. That evidence included the eyewitness testimony from two police officers who saw Petitioner pull the gun from his waistband, point it, and shoot it in the direction of Sutton. Thus, "some fairminded jurists could agree with," *Meders*, 911 F.3d at 1349, rejection of Petitioner's claim. So, federal habeas relief should be denied on Ground Three.

31

**D.    Ground Four:    "Newly discovered evidence (i.e.,
evidence that Petitioner Martinez is "actually
innocent" of the charge in this case)."**

In Ground Four, Petitioner asserts there is "newly discovered
evidence" that shows he is "actually innocent." (Doc. 5 at 28-31).   That
evidence consists of two newly discovered  "eyewitnesses" to the shooting,
David Spring and Joshua Reshard.[10]  Petitioner has admitted (Doc. 5 at
30) that Eleventh Circuit precedent bars his freestanding claim of actual
innocence.  *See Jordan v. Sec'y, Dep't of Corr.*, 485 F.3d 1351, 1356 (11th
Cir. 2007) (recognizing that "our precedent forbids granting habeas relief
based upon a claim of actual innocence…, at least in non-capital cases");
*see also Cunningham v. Dist. Att'y's Off. for Escambia Cnty.*, 592 F.3d
1237, 1272 (11th Cir. 2010) (stating "this Court's own precedent does not

---

[10] During the evidentiary hearing in the Rule 3.850 proceedings, David
Spring testified that he met Petitioner when incarcerated at Gulf
Correctional Institution in 2015 (five years after Petitioner's trial).  (Doc.
14-61 at 473).  Spring testified that during a conversation with Petitioner
Spring remembered that he was actually across the street when the
shooting occurred.  (*Id.*). Similarly, Joshua Reshard testified he met
Petitioner when incarcerated at the Leon County Jail in 2016.  (*Id.* at
488-89).  Reshard testified that during a conversation with Petitioner,
Rashard remembered seeing the shooting incident from his
grandmother's backyard.  (*Id.* at 489).

allow habeas relief on a freestanding innocence claim in non-capital cases"). Because this Court is bound by Eleventh Circuit precedent, the claim Petitioner raises in Ground Four should be rejected. *See Collins v. Sec'y, Dep't of Corr.*, 809 F. App'x 694, 696 (11th Cir. 2020) (holding that because the habeas petitioner's "freestanding actual innocence claim is not cognizable…the district court properly denied it").

**E.    Ground Five:    "The resentencing court erred by considering testimony and evidence that was not properly before the court (resentencing appeal claim)."**

In Ground Five, Petitioner raises a claim involving his resentencing hearing. (Doc. 5 at 31-38). More specifically, Petitioner alleges the trial court violated his federal due process rights at his resentencing hearing by considering evidence (that was not introduced at trial) showing that drugs were involved in the shooting incident. (*Id.*). Respondent argues that Ground Five has not been exhausted. (Doc. 13 at 20-21). The Court agrees. And because state procedural rules prevent Petitioner from returning to state court to exhaust, the claim has been procedurally defaulted. *See Ogle v. Johnson*, 488 F.3d 1364, 1368 (11th Cir. 2007) (explaining that an unexhausted claim has been procedurally defaulted

33

if state procedural rules would prevent a petitioner from returning to state court to exhaust the claim).

As previously explained, the exhaustion doctrine requires petitioners to fairly present the substance of a federal habeas corpus claim to the state courts. *Picard*, 404 U.S. at 278. A petitioner asserting a claim that could arise under either state or federal law "must clearly indicate to the state courts that he intends to bring a federal claim." *Preston v. Sec'y, Fla. Dep't of Corr.*, 785 F.3d 449, 458 (11th Cir. 2015). A petitioner may do this by telling the state court the federal source of law on which he relies, citing a case deciding such a claim on federal grounds, or simply by labeling the claim as "federal." *Baldwin v. Reese*, 541 U.S. 27, 32 (2004). Broad references to a right without indicating the federal nature of the right, are insufficient to "fairly present" a federal claim to the state court. *Baldwin*, 541 U.S. at 32-33.

As the Supreme Court has put it, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, only in federal court, but in state court." *Duncan*, 513 U.S. at 366.

34

Thus, a "petitioner cannot scatter some makeshift needles in the haystack of the state court record. The federal ground relied upon must be presented face-up and squarely; the federal question must be plainly defined." *French v. Warden, Wilcox State Prison*, 790 F.3d 1259, 1271 (11th Cir. 2015) (cleaned up).

Here, Petitioner filed a petition for habeas corpus in the First DCA claiming ineffective assistance of direct appeal counsel. The basis for the claim was an argument that direct appeal counsel failed to raise the sentencing judge's improper statement that drugs were involved in Petitioner's shooting of Sutton when there was no evidence at trial or otherwise regarding drugs. The First DCA agreed that direct appeal counsel performed ineffectively and remanded the matter for resentencing. (Doc. 14-23).

At the resentencing hearing (unlike the initial sentencing hearing), the prosecution introduced evidence of drug involvement. (Doc. 14-34). The sentencing judge proceeded to impose the same twenty-year sentence as before, and the judge this time made clear that her decision to impose twenty years' imprisonment was not premised on a finding that drugs

35

were involved.  (*Id*. at 186).  Petitioner appealed his resentencing to the First DCA, and his brief raised one issue—whether the judge at resentencing violated the First DCA's prior mandate.  (Doc. 14-39 at 11-12).  Petitioner's First DCA brief gave no indication of a federal claim. The brief failed to mention the U.S. Constitution, a federal statute, or a federal case.  Instead, it cited state law cases and advanced a purely state law question of whether a lower court had complied with an appellate court's mandate.  (*Id*. at 3).  The same can be said for the reply brief Petitioner filed.  (Doc. 14-41 at 3).  The First DCA rejected Petitioner's argument and affirmed the resentencing in a summary order.  (Doc. 14-42).

Having reviewed the materials Petitioner filed with the First DCA, Petitioner presented the First DCA with a state law issue regarding compliance with the mandate.  He clearly did not present the First DCA with the Fourteenth Amendment Due Process Clause claim that he now asserts in Ground Five of his habeas petition.  Because Petitioner failed to fairly present this federal claim to the state courts, Ground Five has not been exhausted.  *See Samuel v. Fla. Dep't of Corr.*, No. 20-12002, 2022

WL 3104925, at *3 (11th Cir. Aug. 4, 2022) (holding that petitioner failed to exhaust and procedurally defaulted federal due process claim because none of his state court filings referred to the U.S. Constitution or discussed any federal rights). And Florida law does not permit claims to be raised later if they could have been (but were not) raised on direct appeal. *Spencer v. Sec'y, Dep't of Corr.*, 609 F.3d 1170, 1179 (11th Cir. 2010); *Rodriguez v. State*, 919 So. 2d 1252,1274 (Fla. 2005). Thus, Petitioner cannot now return to state court and raise a federal constitutional challenge to his resentencing. That means Petitioner's claim is procedurally defaulted for federal habeas purposes.[11] *Bailey v.*

---

[11] Petitioner has not provided the Court with any basis for determining that there is cause and prejudice to excuse his procedural default. Nor has he made any showing of a fundamental miscarriage of justice. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991) (explaining that to excuse a procedural default a petitioner must "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim[ ] will result in a fundamental miscarriage of justice"). Here, Respondent raised the exhaustion and procedural default issues in its answer. (Doc. 13 at 20-21). Petitioner filed a reply brief, but it contains no discussion of cause and prejudice for excusing a procedural default of Ground Five. (*See* Doc. 22 at 12). Thus, Petitioner has not met his burden of demonstrating cause and prejudice. *See McCoy v. Newsome*, 953 F.2d 1252, 1260 (11th Cir. 1992) (explaining that a "federal habeas petitioner bears the burden of demonstrating cause and prejudice for his procedural default").

*Nagle*, 172 F.3d 1299, 1303 (11th Cir. 1999) (holding that when an unexhausted claim cannot now be raised in state court because of state procedural rules "the exhaustion requirement and procedural default principles combine to mandate dismissal").   Accordingly, Petitioner is not entitled to habeas relief on Ground Five.

### F.    Ground Six:    "The resentencing court erred by considering testimony and evidence that was not properly before the court (rule 9.141 claim)."

In Ground Six, Petitioner claims that his appellate counsel was ineffective for failing to argue that the resentencing court erred by considering an unsubstantiated allegation that the victim was shot. (Doc. 5 at 38-40).  Petitioner contends if appellate counsel had presented this issue in the resentencing appeal, the First DCA would have remanded for a new sentencing hearing.  (*Id.* at 40).

The *Strickland* standard applies to claims of ineffective assistance of appellate counsel.  *Smith v. Robbins*, 528 U.S. 259, 285 (2000) (holding that *Strickland* is the proper standard for evaluating a claim that appellate counsel was ineffective).

### 1.    The state habeas proceeding

Petitioner presented this claim in his state habeas petition. (Doc. 14-55).  The First DCA denied relief in a one-sentence opinion:  "The petition alleging ineffective assistance of appellate counsel is denied on the merits." (Doc. 14-56).

### 2.    Analysis of Petitioner's claim for habeas relief

The First DCA's summary decision is an "adjudication on the merits" of Petitioner's claim and is thus entitled to deference under § 2254(d).  *Richter*, 562 U.S. at 99.  Because the state court's decision is unaccompanied by an explanation, Petitioner's burden is to "show[ ] there was no reasonable basis for the state court to deny relief."  *Id.* at 98.[12]  As a reviewing habeas court, this Court "must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Court.  *Id.* at 102.

---

[12] The "look through" doctrine does not apply to this claim because the state habeas proceeding was an original proceeding.

And "although the issue of ineffective assistance—even when based on the failure of counsel to raise a state law claim—is one of constitutional dimension," the federal habeas court "must defer to the state's construction of its own law when the validity of the claim that appellate counsel failed to raise turns on state law." *Pinkney v. Sec'y, DOC*, 876 F.3d 1290, 1295 (11th Cir. 2017) (cleaned up).

Under Florida law, a claim that a sentencing court relied on an impermissible factor in imposing sentence may be raised on direct appeal if it amounts to fundamental error. *Nawaz v. State*, 28 So. 3d 122, 124 (Fla. 2010). It follows that, unless the alleged error was fundamental, an attorney did not perform ineffectively by failing to raise it because an attorney is not required to raise meritless arguments. *Pinkney*, 876 F.3d at 1297.

There are two arguments or theories that could have supported the First DCA's rejection of Petitioner's claim. One is that appellate counsel actually raised the issue that Petitioner faulted him for not raising, and the appellate court rejected it. In counsel's direct appeal brief, counsel argued that the resentencing court committed fundamental error by

40

considering impermissible factors at sentencing, including whether drugs were involved and whether Petitioner shot the victim. (Doc. 14-39 at 11, 17-18; Doc. 14-41 at 9-10). The First DCA could have rejected Petitioner's claim based on the theory that the argument was raised and it was found meritless. Thus, appellate counsel could not be faulted for raising an argument that actually was raised and considered. It would have been reasonable under *Strickland* for the First DCA to have made that conclusion.

The other argument or theory that could have supported the First DCA's denial of Petitioner's claim is that, even if appellate counsel failed to argue that the resentencing court erred by considering an unsubstantiated allegation that the victim was shot, the alleged error was not fundamental error under Florida law.[13] *Pinkney*, 876 F.3d at 1298-99 (interpreting the Florida state court's decision rejecting petitioner's ineffective assistance of appellate counsel claim as having been based on the theory that the alleged error in the trial court was not

---

[13] The fundamental error question is an issue of state law. *Pinkney*, 876 F.3d at 1299. Federal habeas courts do not review the propriety of a state court's determination of state law. *Id.* (citations omitted).

fundamental and, as a result, the appellate court would not have granted relief had the issue been raised).  It would have been reasonable under *Strickland* for the First DCA to have made that conclusion.

Petitioner has not shown that the First DCA's rejection of his ineffective assistance of appellate counsel claim was contrary to, or involved an unreasonable application of, clearly established federal law. Accordingly, he is not entitled to habeas relief on Ground Six.

### G.    Ground Seven:  "The cumulative effect of the errors in this case deprived Petitioner Martinez of a fair trial."

In Ground Seven, Petitioner claims the cumulative effect of the errors in this case deprived him of a fair trial.  (Doc. 5 at 40).  Under the "cumulative error" doctrine, the aggregation of non-reversible errors "can yield a denial of the constitutional right to a fair trial, which calls for reversal."  *Insignares v. Sec'y, Fla. Dep't of Corr.*, 755 F.3d 1273, 1284 (11th Cir. 2014).  The Court must examine each of Petitioner's claims of constitutional error and determine whether any actual error occurred. *Id.*  If actual constitutional error occurred, then the Court must examine those errors in the aggregate and in light of the trial as a whole.  *Id.*

When there has been no actual constitutional error, a "cumulative error" claim has no merit. *Id.* (citation omitted).

For the reasons above, the Court has found no actual error. In the absence of any actual error, Petitioner's "cumulative error" claim has no merit.

## V.    Conclusion

Petitioner has not satisfied his burden under § 2254(d) with respect to Grounds One, Two, Three, and Six. Ground Four is not cognizable on federal habeas review, Ground Five is procedurally barred, and Ground Seven lacks merit. Accordingly, Petitioner's amended § 2254 petition should be denied.

## VI.    Certificate of appealability

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." 28 U.S.C. § 2254 Rule 11(a). A timely notice of appeal must

still be filed, even if the Court issues a certificate of appealability.  28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'" *Miller-El v. Cockrell*, 537 U.S. 322, 336  (2003) (quoting § 2253(c)(2)).  "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his [or her] constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" *Buck v. Davis*, 580 U.S. 100, 115 (2017) (citing *Miller-El*, 537 U.S. at 327).  The petitioner here cannot make that showing.  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of  Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to

the attention of the district judge in the objections permitted to this report and recommendation.

For the reasons above, it is respectfully **RECOMMENDED** that:

1.      The amended habeas petition (Doc. 5) be **DENIED** and this case be **DISMISSED**.

2.      A certificate of appealability be **DENIED**.

At Pensacola, Florida, this 18th day of June 2024.

/s/ *Zachary C. Bolitho*
Zachary C. Bolitho
United States Magistrate Judge

### Notice to the Parties

Objections to these proposed findings and recommendations must be filed within fourteen days of the date of the Report and Recommendation.  <u>Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control</u>. An objecting party must serve a copy of the objections on all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.